MOEN, Respondent, vs. INDUSTRIAL COMMISSION and others, Appellants.*

*November 12, 1942—March 9, 1943.*

* Motion for rehearing denied, with $25 costs, on May 18, 1943.

For the appellant Industrial Commission there was a brief by the *Attorney General* and *Mortimer Levitan,* assistant attorney general, and oral argument by *Mr. Levitan.*

For the appellants J. C. Moen and Employers Mutual Liability Insurance Company there was a brief by *Quarles, Spence & Quarles,* attorneys, and *Kenneth P. Grubb* of counsel, all of Milwaukee.

For the respondent there was a brief by *Brazeau & Graves* of Wisconsin Rapids, and oral argument by *Theo. W. Brazeau.*

MARTIN, J. The question raised on this appeal is thus stated in the brief of the Industrial Commission:

"Is an eye totally impaired for industrial use where, because of inability to correlate the vision of the injured eye with the uninjured eye, the employee has little or no use of the injured eye, but in case the vision of the uninjured eye should be lost, the injured eye could be fitted with lenses which would give useful vision?"

In a memorandum opinion filed by the Industrial Commission with its order affirming the findings and order of its examiner, it is said:

"The theory underlying the rule as to loss because of inability to correlate vision of both eyes is that some protective vision remains, and that in event of loss of the uninjured eye, the injured eye will, with correction, be of use and, therefore, of such value that the injured eye cannot be said to be totally impaired for industrial use. The employee has a 'spare' eye, which, although essentially valueless unless vision of the other eye is impaired, becomes of immense value in the event of serious impairment or loss of the uninjured eye."

The report of Dr. Sidney B. Russell was received in evidence by stipulation of the parties. Dr. Russell made the usual and customary tests to determine visual acuity. From his technical findings he concluded that the left eye is normal; that the right eye distance vision without correction amounts to 3.3 per cent, with correction 95.7 per cent; the right eye near vision without correction, 6.8 per cent, with correction 83.6 per cent. On the basis of these and other observations made by Dr. Russell, he concluded that the claimant's industrial vision in his right eye was impaired 73 per cent.

Dr. Lyman A. Copps also submitted a report. Apparently his examination was not as complete as that of Dr. Russell and he reported no determination as to the percentage of impairment but testified upon the trial as follows:

"With correction in the right eye I found he saw 20/33 for distance and for near 14/35."

When asked why he did not put this in his report, he replied:

"These are my findings. The vision I found with correction. The best I could get him to see was 20/33 distance and 14/35 for near. The vision with correction only, and 'only' is in large print, is not the result of injury. The correction which gives him this vision is a condition which is the result of injury, so if I followed the instructions as they were given literally I would not include my correction because that was made for a condition which clearly was the result of an injury.

"Q. With useful correction for all conditions? A. In that I placed zero for distance and zero for near. I did that for

the reason that in order to have useful vision with both eyes he has to wear a ground glass over his right eye, which reduces the vision to approximately zero for both distance and near and that I considered as useful correct for all conditions.

"*Q.* What condition would exist in the absence of shutting off the sight from that eye? *A.* Diplopia in all of his fields. By diplopia I mean double vision.

"*Q.* In the event a man or person was a carpenter would he have any use—any industrial use of this left [right] eye that was injured?"

Objection. Answer taken subject to objection.

"*A.* I would say he would have very little use. I couldn't say he would have no use because it would give him some help in seeing things at his right—grossly, or large objects."

The doctor further testified that with the ground glass, his vision was less than 1/200 or industrially zero. He was asked these questions:

"*Q.* Well, now, I'll have to have you reconcile that with these other figures you have given us. I have with correction he has 20/33 for distance and 14/35 for near. I want you to reconcile those two readings. In other words, if he does have this correction for distance and near it is not useful vision? *A.* Yes; he has it but he can't use it.

"*Q.* In other words, the eyes can be corrected to what you have given me but he can't use that? *A.* But when that correction is put on he has double vision and double vision is more disconcerting—more uncomfortable—more hindering than absence of vision in the right eye.

"*Q.* Then let's see if I have you correct? Distance with correction of 20/33 and 14/35 for near is the correction in that eye, but with that correction he has double vision? *A.* Yes.

"*Q.* So it is not a useful vision? *A.* That is right.

"*Q.* And in order for him to have useful vision you must put ground glass over that eye, which gives him less than 1/200? *A.* That is right.

"*Q.* In other words, doctor, when the right eye has as much useful correction as you can give it—that is, when you get the

best sight that you can get—those fractions that you gave first—when you have made that correction it cannot be used with the other eye. Is that correct? *A.* It cannot be used with comfort.

"*Q.* It cannot be used without the individual seeing double, as you say? *A.* That is right."

On cross-examination the doctor was asked these questions:

"*Q.* When you stated that this gentleman has 100% loss of industrial vision,—did you figure it out on that basis? *A.* I didn't make any statement regarding loss of vision.

"*Q.* Suppose, doctor, we block out the uninjured left eye, what would be the result so far as the right eye is concerned? *A.* Then the right eye would go on and make out the best vision that could be obtained with correction.

"*Q.* Then in other words, if he lost the sight of his left eye, he would have some industrial use of the right eye? *A.* Yes."

Upon this evidence the Industrial Commission made the following decision:

"The question to be decided is the extent of applicant's permanent disability by reason of injury to his right eye on April 1, 1938. The examiner found that the permanent disability consists of 74.48% loss of vision of the right eye.

"Sec. 102.52 (13) provides that for total impairment of one eye for industrial use there shall be paid 250 weeks' compensation. Sec. 102.55 (5) provides for the relating of partial loss proportioned to the basis of total disability of a member or organ. Based on 74.48% loss of vision of one eye there is payable 186.2 weeks' compensation. It is applicant's contention that his injury has resulted in total impairment of his right eye for industrial use, and that he is, therefore, entitled to 250 weeks' compensation for his impairment.

"The testimony establishes that applicant's injury has resulted in an aphakic or cataractous eye. That condition causes inability to correlate the vision of the injured right eye with the uninjured left eye. Because of the failure to correlate applicant has presently little or no use of the injured eye. With

the use of a correcting lens some vision can be obtained. The lens, however, cannot be used to effect binocular vision. If, however, the left eye should become impaired, applicant's right eye would give useful vision to the extent that a lens will restore vision.

"In determining loss of visual efficiency under the Workmen's Compensation Act the commission has adopted certain rules, the second revision of which became effective on January 1, 1936. The rules adopted by the commission are essentially those which were formulated by a committee of the American Medical Association appointed to consider methods for determining visual efficiency for purposes of workmen's compensation. Certain values are assigned to each of three factors, viz., central vision acuity, field vision and binocular vision. The percentage of remaining function for each of these factors is determined by means of various tests and tables found by experience and judgment to be sound. When the percentage of function under the various factors has been determined, the final percentage of efficiency is fixed by means of a formula incorporated in the rules. These rules were adopted by the commission after long study in an attempt to obtain uniformity and to effect substantial justice to employees. The commission considers that they will represent the most scientific and equitable method of determination of loss of vision which has been evolved. Copy of these rules is attached to this memorandum and incorporated with it.

"It will be noted that for loss of binocular vision a reduction factor of 50% is introduced after determination of loss by reason of impairment of visual acuity and field of vision. The theory underlying the rule as to loss because of inability to correlate vision of both eyes is that some protective vision remains, and that in event of loss of the uninjured eye, the injured eye will, with correction, be of use and, therefore, of such value that the injured eye cannot be said to be totally impaired for industrial use. The employee has a 'spare' eye, which, although essentially valueless unless vision of the other eye is impaired, becomes of immense value in the event of serious impairment or loss of the uninjured eye.

"The commission concludes that the examiner's finding, computed on the basis of the rules adopted, is correct, and that in view of the remaining useful vision in applicant's eye, the disability is not that of total impairment of the eye for indus-

trial use, but is that of partial impairment to the extent found by the examiner."

The examiner whose order was being reviewed found as follows:

"That as a further result of his injury, the applicant sustained a permanent disability resulting in 74.48% loss of vision in the right eye."

While the commission upon petition for review confirmed the finding of the amount of loss of vision, the commission supplemented the examiner's finding as follows:

"That in view of the remaining useful vision in applicant's eye, the disability is not that of total impairment of the eye for industrial use, but is that of partial impairment to the extent found by the examiner."

The commission having found upon this evidence that the claimant has 25.52 per cent useful vision for industrial use, we do not see upon what basis this finding can be overturned.

It is to be noted that the conclusion of the commission is not based upon the amount of vision in the injured eye. The vision in the injured eye with correction was found to be 95.7 per cent for distance and 83.6 per cent for near. The amount found for useful industrial vision for the right eye was 25.52 per cent, in other words, that the impairment for industrial purposes was 74.48 per cent. This increase in the amount of impairment in the injured eye is due to the fact that by reason of the injured eye, claimant is deprived of binocular vision,—the co-ordinated use of both eyes. The claimant has monocular vision, that is, the use of but one eye at a time. If claimant had 100 per cent vision in each eye but had sustained a loss of binocular vision, that is, could use but one eye at a time, his industrial vision would still be impaired. The extent of this impairment involves an intricate calculation based upon certain formulas derived from long experience, adopted by the Industrial Commission. After making

these allowances based upon the observation of the experts who testified in this case, the commission reached the conclusion that the extent of the impairment of industrial vision in the right eye was 74.48 per cent, whereas using the right eye alone, the impairment of useful vision was an average of 10.35 per cent. It appearing that there is a loss of industrial vision when binocular vision is destroyed, the extent of that impairment is for the commission. What it does is to assess on the basis of the facts found the amount of the industrial impairment as compared with the amount of useful vision when the injured eye is considered by itself. In other words, the injured eye is considered as having some industrial vision. The amount found in this case, to be sure, is only 25.52 per cent but the eye in the present condition cannot be said to be wholly useless from an industrial standpoint. If the commission had based its determination solely upon the useful vision of the eye with correction considered by itself, the commission certainly would have been in error; but when it assessed the value of the useful vision in the right eye as affected by the loss of binocular vision, it did exactly what the statute requires. it to do.

The fact that the eyes of the claimant cannot both be used at the same time does not warrant the conclusion that the injured eye is wholly lacking in industrial vision. If both eyes had 100 per cent vision and the claimant had a loss of binocular vision, there nevertheless would be an impairment of industrial vision. Certainly it could not be said under such circumstances that the eye not being used had no industrial vision. In such a case the party who suffered loss of binocular vision might use one eye one day and the other eye the next day, but applying the theory on which this case was decided in the trial court, the eye not in use would be held to have no industrial vision. That conclusion would be clearly contrary to the fact. Considered by itself the injured eye in this case had a high percentage of useful vision; allowing for the fact that the loss of binocular vision impaired the vision of the claimant, the

commission found the amount of useful industrial vision of the injured eye to be only 25.52 per cent.

The question is, has claimant suffered the total impairment of his right eye for industrial use? Whether there has or has not been total impairment of the eye for industrial use presents a question of fact for the commission to decide. There being credible evidence to sustain the finding of the commission, its finding is conclusive. If the evidence sustains a finding that impairment of the eye for industrial use was not total, the commission had to determine the extent of disability under the relative-injury clause (sec. 102.55 (5), Stats.). This also presented a question of fact for the commission. There being credible evidence to sustain the finding that the loss of vision was 74.48 per cent of the right eye, that finding is conclusive.

*By the Court.*—Judgment reversed. Cause remanded with directions to enter judgment confirming the order of the Industrial Commission.